UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JOY LYNN VIESSMAN<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>Defendant. | 4:19-CV-04063-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Joy Lynn Viessman, seeks judicial review of the Commissioner's

final decision denying her application for social security disability and

supplemental security income disability benefits under Title II and Title XVI of

the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Ms. Viessman filed her application for both types of benefits.  AR10; 215-226.  Her coverage status for SSD benefits expires on December 31, 2021.  AR10; 252.  In other words, in order to be entitled to Title II benefits, Ms. Viessman must prove disability on or before that date.

Ms. Viessman has filed a complaint and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings. See Docket Nos. 1 and 14. The Commissioner has filed his own motion seeking affirmance of the decision at the agency level. See Docket No. 16.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from Ms. Viessman's application for social security disability benefits and supplemental security income benefits filed on May 9, 2016, alleging disability since May 8, 2016, due to depression, fear of leaving her home, anxiety, driving phobia, back pain, female issues, and fear of people and crowds. AR215, 225, 277.

Ms. Viessman's claims were denied at the initial and reconsideration levels and Ms. Viessman requested an administrative hearing. AR170, 181, 187, 194.

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket 13). The court has made only minor grammatical and stylistic changes. Citations to the appeal record will be cited by "AR" followed by the page or pages.

Ms. Viessman's administrative law judge ("ALJ") hearing was held in May of 2018, at which different counsel represented Ms. Viessman. AR74. An unfavorable decision was issued August 6, 2018, by ALJ Richard Hlaudy. AR7.

At Step 1 of the evaluation, the ALJ found that Ms. Viessman had not engaged in substantial gainful activity since May 8, 2016, the alleged onset of disability date, and that she was insured for benefits through December, 2021. AR12.

At Step 2, the ALJ found that Ms. Viessman had severe impairments including status post L4-L5, L5-S1 fusion, depression and anxiety. AR13. The ALJ also found that Ms. Viessman had a medically determinable impairment of sleep apnea, but determined it was non-severe. AR13.

At Step 3, the ALJ found that Ms. Viessman did not have an impairment that meets a Listing. AR13. The ALJ found that Ms. Viessman's mental impairments caused mild restrictions in understanding, remembering, or applying information; moderate limitations in concentration, persistence or maintaining pace, and that she had mild limitations in adapting or managing oneself. AR14.

The ALJ determined that Ms. Viessman had the residual functional capacity ("RFC") to perform:

> less than a full range of sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a). The claimant can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. She can stand and walk 2 hours in an 8-hour workday and sit 6 hours. She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid even moderate exposure to hazards. The claimant is limited to performing simple routine

repetitive tasks.  She can have occasional and superficial
interaction with the public and coworkers.

AR15.

Based on this RFC, the ALJ determined at Step 4 that Ms. Viessman

could not perform her past relevant work.  AR21-22.

At Step 5, relying on the testimony of a vocational expert, the ALJ found

that Ms. Viessman could perform the occupations of credit clerk (DOT

237.367-014), document preparer (DOT 249.587-018), and telephone quotation

clerk (DOT 237.367-046).  AR22-23.

Ms. Viessman timely requested review by the Appeals Council, which

denied review making the ALJ's decision final, and Ms. Viessman timely filed

this action.  AR1-6, 213.

**B.    Plaintiff's Age, Education and Work Experience**

Ms. Viessman was 44 years old at the time of the decision, and she

completed the 12th grade in 1992.  AR225, 278.  Ms. Viessman had relevant

work as a day care owner and a travel agent.  AR21.

**C.    Relevant Medical Evidence (chronological order)**

Ms. Viessman contacted Sanford Family Medicine Clinic on October 26,

2015, to report that her anxiety had been much worse, that a panic attack the

previous week required ambulance transfer from Dell Rapids Hospital, and that

she had been prescribed Vistral for her anxiety.  AR494.

Ms. Viessman contacted the Sanford Family Medicine Clinic again on

October 30, 2015, again with increased anxiety, and requested that her anxiety

medication be switched back to Xanax.  AR493.  Ms. Viessman was seen at the

Sanford Hospital ER the same day due to a panic attack, and she had been forced to close her day care and send the children home. AR489. Her diagnoses included low back pain, anxiety, severe major depression with psychotic features, insomnia, migraine, herniated disc, degenerative disk disease, lumbar radicular pain, panic attacks and morbid obesity. AR489-90. Ms. Viessman was given Ativan for her anxiety and the ER physician expressed concern with Ms. Viessman's long-term treatment of her anxiety with Xanax. AR493.

Ms. Viessman was seen at USD Physicians Clinic on November 3, 2015, for her depression and anxiety. AR486. She reported that she has a phobia for highways and gets scared and anxious even as a passenger in a vehicle. AR486. Xanax and Lexapro were prescribed, and counseling was recommended. AR489.

Ms. Viessman presented to the Sanford ER on November 11, 2015, reporting that her prescribed medications did not help and with complaints of anxiety, inability to sleep, and stress related neck and shoulder pain. AR482. Ms. Viessman was given Haldol, and counseling was recommended. AR485.

Ms. Viessman returned to the ER again on November 14, 2015, with severe anxiety and left shoulder pain. She was given Toradol and valium, was told to follow-up with her primary care physician, and it was recommended she see a psychiatrist for her chronic anxiety. AR473, 477.

Ms. Viessman was seen at USD Physicians Clinic on November 23, 2015, and reported ongoing anxiety. AR470. Her Xanax was continued, her Lexapro

dosage was increased, Ativan was also prescribed, and it was recommended that she go to Avera Behavioral Health for an assessment.  AR472. Ms. Viessman contacted the clinic later the same day to inform them that she was at Avera Behavioral Health[3] waiting for a psychological assessment. AR473.

Ms. Viessman was seen at Sioux Falls Psychological Services on December 2, 2015, by referral from Avera Behavioral Health following inpatient treatment for suicidal ideations, anxiety, and depression.  AR353. Ms. Viessman reported panic attacks in June and October, 2015, that led to 911 calls and hospitalization, and a prior suicide attempt in 1994.  AR354. Her mood was depressed.  AR354.  She was scheduled for counseling the next week.  AR356.

Ms. Viessman was seen at USD Physicians Clinic on December 2, 2015, following inpatient treatment at Avera Behavioral Health for anxiety and suicidal ideations.  AR466.  Her Xanax had been stopped, and Klonopin and Remeron were prescribed.  AR466.  She was advised to start counseling as soon as possible. AR469.

Ms. Viessman was seen for counseling at Sioux Falls Psychological Services on December 14, 2015.  AR358.  Ms. Viessman was observed to be tearful and moderately anxious and depressed.  AR358.  She noted that her ex-husband was staying with her and had been abusive since being released from

_____

[3] There are no treatment notes from Avera Behavioral Health in the transcript. The records appear to have been requested, but not received.  AR626.

jail. AR358. Ms. Viessman reported that her anxiety medication had been increased. AR358.

On January 4, 2016, Ms. Viessman reported to therapists that she, with the encouragement of friends and family, decided to end contact with her ex-husband. AR360. After ending the contact Ms. Viessman reported feeling empowered, having decreased depression and anxiety, and having an increased ability to drive without panic. AR360. She continued counseling sessions through February, 2016. AR360-66.

Ms. Viessman saw her primary care physician at USD Physicians Clinic on January 11, 2016, and reported that her depression and anxiety were significantly better. AR362, 364, 447-48. Ms. Viessman reported being satisfied with her medications, which included Remeron, Ativan, and Klonopin. AR448. She was seen again on January 29, 2016, for lower back and hip pain. AR444. Toradol was given and Flexeril prescribed. AR447.

Ms. Viessman was also being seen during this period at the hospital and clinics for vaginal and abdominal pain and bleeding. See e.g., AR405, 414, 433, 437-38, 442. She eventually had a hysterectomy on June 15, 2016. AR394.

Ms. Viessman was seen at the Sanford Orthopedic Clinic on May 4, 2016, for thoracic back pain, bilateral shoulder pain, and hip pain that started a week earlier after starting a new job working with a conveyor belt that required repetitive arm/shoulder motions. AR428. She also complained of chronic low back pain and "limping on the right side." AR428. Examination

revealed a somewhat reduced range of motion of the spine, tenderness to right upper thoracic muscles but with normal strength and tone and intact reflexes. AR431. Prednisone was prescribed, along with Baclofen and physical therapy. AR431.

Ms. Viessman was seen at USD Physicians Clinic on May 10, 2016, and reported her depression had gotten worse, she was not leaving her house, driving was not an issue, but she had lost two jobs. AR425. Mental status examination revealed normal behavior, judgment and thought content. AR408. Ms. Viessman was also waiting to see Dr. Boetel for her severe low back pain with a lot of radiation to her buttocks. AR425. Examination revealed lumbar tenderness, edema, pain and spasm, and a depressed mood. AR427. Toradol was given and counseling recommended. AR428.

Ms. Viessman was seen for physical therapy on May 16, 2016, and examination revealed tenderness, limited range of motion and pain in shoulder area. AR421-22. The physical therapist noted that Ms. Viessman's rehabilitation potential was good. AR422. Ms. Viessman displayed a mobility dysfunction of the shoulder and the thoracic lumbar region as well as the stability motor control dysfunction of the scapular stabilizer musculature. AR422.

Ms. Viessman was seen at USD Physicians Clinic on May 25, 2016, and reported increased anxiety and watery diarrhea leading to incontinence with continued low back pain. AR418. Ms. Viessman reported that a prior epidural injection had worked really well and that she wanted to receive additional

shots.  AR418.  Physical examination revealed normal range of motion, reflexes, muscle tone, and coordination, and her lumbar back exhibited tenderness, pain and spasm.  AR420. Mental status examination revealed normal behavior, judgment and thought content, and her mood was anxious and depressed. AR420.

Following her hysterectomy, her abdominal pain had improved, but her back pain continued with Percocet prescribed for pain.  AR379.

Ms. Viessman was seen for another intake session at Sioux Falls Psychological Services on July 7, 2016, and her affect was labile, mood depressed and anxious, and her thought processes were inhibited by her anxiety, which in combination with her depression, made it difficult for her to leave her home.  She was also unable to work.  AR369-70.

Ms. Viessman was seen at USD Physicians Clinic on July 11, 2016, for increased depression, and she was unable to be around people.  AR375.  Her Lexapro was discontinued, Celexa was prescribed, and her Klonopin dosage was increased.  AR377.

Ms. Viessman was seen at Sanford Acute Care on July 20, 2016, for bilateral hip and low back pain, which was worse since her hysterectomy. AR735.  She reported numbness in the hip area in addition to pain, as well as numbness and tingling in her low back.  AR735.  Examination revealed tenderness across her low back, bilateral hips, and buttocks.  AR735.  Toradol was given, and also a few Percocet.  AR735.

Ms. Viessman was seen at USD Physicians Clinic on July 28, 2016, with ongoing low back pain, and she reported the Percocet was not helping her pain. AR731.  Examination revealed tenderness and decreased range of motion in the hips, tenderness, pain, and spasm in the lumbar back, and depressed mood. AR734.  Toradol was given and additional Percocet prescribed.  AR734.

Ms. Viessman was seen at Sanford Hospital on August 5, 2016, after her low back pain was exacerbated by a fall on her stairs.  AR727.

Ms. Viessman saw Dr. Boetel at Sanford Physical Medicine on August 23, 2016, for her hip and back pain.  AR720.  Examination revealed antalgic gait, lumbar and sacral sulcus tenderness, normal hip rotation, but with pain, and physical therapy was recommended.  AR721.

Ms. Viessman was seen at USD Physicians Clinic on September 21, 2016, and had been sick for over 10 days with cough and congestion, and she had not started PT for her back, stating she didn't think she could do PT if her pain was not under control.  AR714.  She also reported her anxiety and depression were worse and she was having problems communicating and going out of her house, and being compliant with her job.  AR714.  Ms. Viessman was given a stronger antibiotic, pain medication, and counseling was recommended.  AR717.

Ms. Viessman was seen for PT on October 5, 2016, and examination revealed moderate antalgic gait, limited range of motion with pain, and pain with sit to and from stand.  AR710.  She was found limited in her ability to walk, engage in prolonged standing, and sleep.  AR710.

Ms. Viessman was seen at the Sanford ER on October 7, 2016, after her leg gave out while bending to pick something up and she fell.  AR705.  Examination revealed right leg weakness with pain when raising the right leg.  AR708.  A lumbar MRI and hip x-ray were not acute and Viessman was told to follow-up with her primary care physician for the exacerbation of a chronic issue.  AR709.  The hip x-ray did reveal mild degenerative changes.  AR747.

Ms. Viessman followed up at USD Physicians Clinic on October 10, 2016, and reported a lot of weakness, worse pain and she was using a cane.  AR701.  Continued PT was recommended and her pain medication was continued.  AR704.

Ms. Viessman was seen at USD Physicians Clinic on October 13, 2016, following a fall, and presented crying and in a wheelchair.  AR699.  She was sent to the Sanford Orthopedic walk-in clinic.  AR699.  She was crying in the exam room and unable to be examined due to pain.  AR699.  Transfer to the ER was recommended.  AR699.  A CT of her spine was obtained which revealed no acute fractures or hardware changes in her prior fusion, but showed diffuse sclerotic changes of the sacroiliac joints which may be related to an element of sacroiliitis.  AR744-45.  The ER gave her Toradol and prescribed Neurontin.  AR698.

Ms. Viessman was discharged from PT following two PT sessions and one water therapy session when she missed her last appointment on November 2, 2016.  AR700.

Ms. Viessman was seen at USD Physicians Clinic on November 18, 2016, for tingling in her right arm and leg and twitching in her right eye, and complained that she felt she may have attention deficit disorder. AR684. She was scheduled for an ADHD evaluation and EMG nerve conduction testing on upper and lower extremities was also planned. AR686.

The ADHD or mental health evaluation was done on November 21, 2016, at Sanford Family Medicine Clinic and the diagnoses were anxiety disorder, depressive disorder, history of panic attacks, and rule out personality disorder and ADHD, and she was referred to Sanford Psychiatry for further evaluation. AR682. Sanford Case Management initiated contact with Ms. Viessman on November 29, 2016, and noted she continued to ambulate with a cane. AR677.

Ms. Viessman was seen at Sanford Neurology on January 16, 2017, for continued low back pain and increased intermittent tingling in her right arm and right leg, numbness and weakness in her right leg, and intermittent shaking in her right arm. AR668. She also reported impaired gait, joint pain, stiffness and swelling, and muscle pain in her low back. AR668. Examination revealed limited strength test for hips due to pain, decreased sensation to pinprick in upper and lower extremities, reduced vibration sensation on the right, unsteadiness with eyes closed, and antalgic gait with unsteady tandem walk. AR671. Muscle bulk and tone were normal. AR671. An x-ray revealed that the L1 through L4 disc spaces appeared maintained. AR671. EMG nerve conduction tests, physical therapy evaluation, head MRI, ENT referral for

hearing loss, and psychiatric referral for anxiety were planned. AR672. The brain MRI was normal. AR665.

Ms. Viessman saw a psychiatrist at Sanford Psychiatric Clinic on January 24, 2017, for depression and anxiety. AR819. She reported that her grandfather had recently died, and she had not spoken to her family since the prior May. AR819. Ms. Viessman reported struggling with mood swings 2-3 times per day, making impulsive decisions, anger, irritability, and poor concentration and energy level. AR819. Examination revealed Ms. Viessman was ambulating with a cane, had lost one hundred pounds over the last year, experienced back pain, appeared older than her age, was anxious, endorsed some paranoia, and her insight and judgment were fair. AR822. Her diagnoses included anxiety disorder, and differential of Bipolar 2, unspecified mood disorder. AR822. Seroquel was added to her Lexapro, Klonopin, and Neurontin, and individual therapy was encouraged. AR822.

Ms. Viessman had an MR angiogram of her neck on January 26, 2017, that was normal. AR737. Ms. Viessman had a brain MRI performed on January 25, 2017, which was normal. AR739-40.

Ms. Viessman saw a psychologist at Sanford Psychiatric Clinic on February 6, 2017, and reported she had been unable to start taking Seroquel because she could not afford it. AR827. Examination revealed disturbed sleep, up and down mood, anger, back pain, fair to good memory, insight and judgment. AR828-29. Ms. Viessman's PHQ-9 score indicated severe

depression. AR829. The diagnoses were major depression, anxiety, and rule out personality disorder, and additional therapy was planned. AR830. Ms. Viessman continued therapy with her third session on May 12, 2017. AR823. Her rule out personality diagnoses had been updated to unspecified personality disorder. AR833.

Ms. Viessman saw her psychiatrist at Sanford Psychiatric Clinic on May 23, 2017, and reported worsening depression and anxiety. AR835. Her Lexapro medication was stopped and Cymbalta was added for depression, anxiety and chronic pain; trazodone was also prescribed. AR836.

Ms. Viessman was seen at the Sanford ER on June 19, 2017, presenting with a panic attack after stopping her medications a week earlier. AR781. She had contacted her psychiatric doctor and her pain doctor and they told her to resume her medications and go to the ER. AR781. Ms. Viessman was taking Percocet and Neurontin. AR781. Examination revealed tenderness and pain in her low back, but she had normal strength and no swelling, edema, or neurological deficits. AR787. Examiners also noted anxious mood, rapid pressured speech, agitation, and that Ms. Viessman was crying. AR787. Ativan, Zofran, Toradol, Oxycodone, Valium, and Fentanyl were administered. AR787-78. Her diagnoses were opioid withdrawal, panic attack, and having stopped her recommended medications. AR779.

Ms. Viessman saw her psychiatrist at Sanford Psychiatric Clinic on June 27, 2017, and reported she had restarted her medications on June 20, 2017. AR839. She reported high anxiety and feeling anxious leaving her home and

being in public places or talking to people. AR839. She also reported depressed mood with feelings of hopelessness and suicidal ideation without any plan. AR839. Ms. Viessman said her energy level was variable with some days very high and others very low, and her concentration was poor. AR839. Her assessments were anxiety disorder, social anxiety disorder, bipolar II disorder, and a differential diagnosis of unspecified mood disorder. AR840. Her Cymbalta dosage was increased and counseling encouraged.

Ms. Viessman was seen at the Sanford ER on July 17, 2017, with exacerbated low back pain after tripping over a hole and falling. AR789. Examination revealed low back tenderness, pain and reduced range of motion, and Ms. Viessman was ambulating with a cane. AR789.

Ms. Viessman saw a new psychiatrist at Sanford Psychiatric Clinic on August 1, 2017, and reported worsening depression and anxiety after stopping Cymbalta about one month earlier due to being unable to afford it; being unemployed and without insurance. AR843. Ms. Viessman said she had severe withdrawal symptoms and was fearful of taking another similar medication. AR843. She reported looking for a therapist at Carroll Institute because she did not feel there was a good working relationship with her psychologist at Sanford. AR843. Ms. Viessman continued to report suicidal ideations without any plan. AR844. The diagnoses were modified to bipolar II versus major depression with psychotic features versus personality traits. AR845. Prozac was prescribed, her Trazodone dosage increased and

counseling encouraged.  AR845.  Psychological testing should be considered if Ms. Viessman obtained insurance in the future.  AR845.

Ms. Viessman saw another new psychiatrist at Sanford Psychiatric Clinic on September 25, 2017, and reported the Prozac had caused severe sedation and was switched to Lexapro about one week prior.  AR847.  Sandra Peynado, M.D., noted that Ms. Viessman made good eye contact, exhibited normal psychomotor activity, and denied suicidal ideation and hallucinations.  AR851. Dr. Peynado also noted no impairment in cognition, intact memory, and fair insight and judgment.  AR851.  Dr. Peynado's diagnoses included generalized anxiety disorder, social anxiety disorder with agoraphobia, and bipolar disorder type II and her differential diagnoses included cluster B traits, major depressive disorder recurrent and paranoid personality disorder.  AR851.

Ms. Viessman saw the psychiatrist again on October 23, 2017, and reported ongoing depression without help from the medication, and financial struggles and no insurance; she had not been to counseling.  AR853. Ms. Viessman reported feeling tired on Lexapro and spending most of the days watching TV on the couch with no motivation.  AR853.  Electroconvulsive therapy (ECT) was planned for her resistant depressive symptoms, and her other medications were continued.  AR854.

Ms. Viessman saw the psychiatrist again on January 30, 2018, but the treatment note does not mention ECT treatment or whether it was performed. AR857.

### D. Consultative Physical Examination

Ms. Viessman was referred to Dr. Lichter by the state agency for a disability exam on October 10, 2016. AR642. She reported working part-time at a hotel and said it "keeps her sane" because it gets her out of the house, but it does aggravate her mental and physical health. AR642. Ms. Viessman explained that she experienced a lot of anxiety at work and felt like she might snap at customers, and that sitting during her 4-6 hour shift at the front desk hurt her back, but they do let her sit. AR642-43. Ms. Viessman reported that for her back she was in physical therapy, taking Percocet for pain, and a recent MRI showed her back was stable, and also that her primary care physician had completed a form for her to get a handicap sticker. AR643. She reported that being in one position too long makes her pain worse, and she can only sit or stand for 10 minutes at a time, had increased weakness in her right leg, used a cane to walk, could not stoop, climb or kneel, could only lift up to 10 pounds and avoided any activity which might flare up her back. AR643. Examination revealed tenderness over the lumbar and sacral regions, muscle spasm on the right side, positive straight leg raise at 30 degrees on the right and 45 degrees on the left, strength at 4 out of 5 in bilateral lower extremities, decreased sensation in the right leg, reduced range of motion secondary to pain, increased pain with internal and external rotation of both hips, walks with a limp, and utilized a cane for ambulation. AR644. Dr. Lichter suspected the decreased strength was due to pain. AR644. Dr. Lichter's physical diagnosis was chronic low back pain with right radiculopathy. AR644. Dr. Lichter stated

that based on her objective exam findings Ms. Viessman would be limited to lifting and carrying 10 pounds occasionally and no more at any time, and Ms. Viessman would have difficulty standing, walking, or sitting during an 8-hour workday, but she would do better if allowed to change positions frequently. AR644. Dr. Lichter stated Ms. Viessman could not stoop, climb, or kneel. AR644. Dr. Lichter stated the prognosis for Ms. Viessman's chronic low back pain was poor as she had already had surgery and injections. AR644. Dr. Lichter invited questions and provided her phone number. AR644.

**E.    Consultative Psychological Examination**

Ms. Viessman was referred to psychologist, Dr. VanKley, by the state agency for a disability exam on October 21, 2016. AR652. Ms. Viessman reported that she was working 20 hours per week at the time. AR654. Dr. VanKley observed Ms. Viessman to have an anxious and depressed mood with congruent affect, and she conveyed a strong sense of being overwhelmed with various difficulties and viewing disability benefits as her only means of subsistence. AR655. Dr. VanKley stated that despite Ms. Viessman's emotional distress, she was cooperative and appeared to respond in a forthright manner, so the results provide a reasonable indication of her functioning. AR655. Examination revealed a depressed and anxious mood with several occasions of tearfulness. AR655. Dr. VanKley diagnosed panic disorder, obsessive-compulsive disorder, depression, and personality disorder, and he assessed Ms. Viessman's GAF at 45. AR658. Dr. VanKley stated the results of his evaluation indicated Ms. Viessman indeed struggled with a

18

combination of anxiety and mood-related problems, and her panic disorder
made it difficult to venture into the public; symptoms of obsessive-compulsive
disorder consumed an inordinate amount of time; and her existence was
dominated by anxiety, which contributed to her depression, which was "readily
evident during the clinical interview."  AR658.  Dr. VanKley stated her
impairments interfered with her ability to get along with people, and she
became highly reactive to interpersonal conflict.  AR659.  Dr. VanKley did not
recommend a representative payee for Ms. Viessman's disability benefits,
noting she was anxiously meticulous about such matters.  AR659.

**F.      State Agency Assessments**

Ms. Viessman's case was reviewed at the initial level on November 16,
2016, and the state agency physician found that she had severe disorders of
the back-discogenic and degenerative.  AR113, 122.  The physician found
Ms. Viessman could lift 10 pounds occasionally, and less than 10 pounds
frequently, stand and/or walk two hours of an 8-hour workday, sit about six
hours of an 8-hour workday, and that she had additional postural limitations.
AR118.  The agency physician stated Ms. Viessman's statements about
intensity, persistence and functionally limiting effects of her symptoms were
substantiated by the objective medical evidence alone.  AR116.  The agency
physician noted findings from the consultative physical exam, but did not
explain why they failed to adopt all of the limitations noted.  AR116.

Ms. Viessman's file was reviewed by a state agency physician at the
reconsideration level on February 6, 2017, and the reconsideration level

physician made identical findings, including that Ms. Viessman's statements about intensity, persistence and functionally limiting effects of her symptoms were substantiated by the objective medical evidence alone. The State agency physician at the reconsideration level again noted the findings from the consultative physical exam, but again did not explain why he failed to adopt all of the limitations noted. AR146-49.

Regarding her psychological limitations, Ms. Viessman's file was reviewed at the initial level on November 28, 2016, by a "single decision maker" or SDM who found Ms. Viessman had severe affective disorder, severe anxiety disorder, and severe personality disorder. AR113, 115. The SDM found that she had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. AR114. The SDM noted results from the consultative psychological evaluator who had assessed Ms. Viessman's GAF at 45, but did not discuss any of the findings. The SDM more specifically found Ms. Viessman moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended times, working with others, interacting appropriately with the public, and traveling in unfamiliar places or using public transportation. AR118-20. The SDM stated Ms. Viessman's anxiety will lead to periods of reduced concentration, but she would be able to follow simple instructions. AR119. The SDM also stated Ms. Viessman would have difficulty with increased social demands and interpersonal conflict leading to the need for brief breaks. AR119. The SDM

stated Ms. Viessman retained the ability to engage in simple, routine and repetitive work in environments with limited social demands and interactions with the public. AR120.

The state agency psychological consultant at the reconsideration stage reviewed the file on February 7, 2017, and made similar findings as prepared by the SDM at the initial level. AR144, 149-51. The consultant at the reconsideration level was a psychologist. AR151.

**G.    Testimony at the ALJ Hearing**

**1.    Ms. Viessman's Testimony**

Ms. Viessman testified that she was 5'7" tall and weighed 195 pounds, but has lost 115 pounds in the last four years, and she was right-handed. AR80.

Ms. Viessman testified that she worked at Fit My Feet part-time but stopped because of "all the crap in my head" and her back situation, which limits her to not standing more than 20 or 30 minutes. AR81-82. Ms. Viessman testified that her last work was at a hotel where she had an "explosion." AR86. She explained that she became super mad, super aggravated, people were coming in and she just couldn't contain "the shut off in my brain to be safe, or like, are they going to hurt me...." AR86. She said she was scared of new people which is why she maybe left her home five or eight times this whole year. AR86, 88. Ms. Viessman said, "Like if I open the door it's like – if I see somebody on the street and I happen to step outside, it

feels like Flash Gordon coming right at me; like what are they going to do to me. You know? So I go back in and lock the doors and don't move." AR87.

Ms. Viessman testified that one day when she was home alone somebody knocked on the door and she ran and hid in the closet. AR99.

Ms. Viessman testified, "But I want to be fixed. I've always worked. You know, I worked hard. And I don't know. I wish I could just pound it out. Like I go to bed and it just turns and turns and turns about stuff that I have like no control over or --." AR100.

Ms. Viessman testified her psychiatrist recommended electroconvulsive therapy, but she couldn't afford $6,000 per session. AR87.

Ms. Viessman had difficulty staying focused on the questions asked of her during the hearing, and gave numerous off-topic or rambling responses. See, e.g., AR82 (ALJ stating, in response to Ms. Viessman's response, "I need to stop it. This hearing is going to take a long time."); AR86 (Ms. Viessman's attorney attempting to get Viessman to explain what happened when she had the "explosion" at her hotel job); AR89 (rambling response); 102-03 (ALJ's attempt to ask Ms. Viessman about her sleep apnea).

### 2.    Vocational Expert Testimony

The ALJ asked the vocational expert ("VE") a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ, and the VE testified that the individual would be unable to perform any of Ms. Viessman's past relevant work. AR103-04. The VE testified that the individual could do the work of a credit clerk, DOT #237.367-014, document

22

preparer, DOT #249.587-018, and telephone quotation clerk, DOT #237.367-046, and provided the number of jobs available nationally for each occupation, including 42,000 credit clerk jobs, 44,000 document preparer jobs, and 86,000 telephone quotation clerk jobs.  AR104-05.

The VE testified that if an individual were late, absent, or left work early more than two times per month they would not be capable of competitive employment.  AR105.  The VE also testified that an individual who did not have the ability to respond appropriately to supervision, coworkers, and usual work situations, such that the individual would have confrontations in the workplace once a month resulting in work stoppage, they would be given a warning the first time and then dismissed if it ever happened again.  AR105.

## H.    Other Evidence

Ms. Viessman stated in a Function Report completed in July, 2016, that she did not have problems with her personal care, but later when she completed a Disability Report in December, 2016, she reported that stairs were impossible, climbing into the tub or shower was a problem, a handle had to be installed on the wall, and she had fallen more times despite using a cane. AR309.

## DISCUSSION

## A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Biestek v. Berryhill</u>, 587 U.S. ___, 139 S.

Ct. 1148, 1154 (2019); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).

Substantial evidence is defined as more than a mere scintilla, less than a

preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support the Commissioner's conclusion. <u>Biestek</u>, 139 S. Ct. at

1154; <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>,

514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the

record for evidence supporting the [Commissioner's] findings, and requires a

scrutinizing analysis, not merely a rubber stamp of the [Commissioner's]

action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008)

(cleaned up).

 In assessing the substantiality of the evidence, the evidence that detracts

from the Commissioner's decision must be considered, along with the evidence

supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not

be reversed merely because substantial evidence would have supported an

opposite decision. <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993); <u>Reed v.</u>

<u>Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two

inconsistent positions from the evidence and one of those positions represents

the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v.</u>

<u>Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should

neither consider a claim de novo, nor abdicate its function to carefully analyze

the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000)

(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. <u>Walker v. Apfel</u>, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. <u>Smith</u>, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[4] The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB

_____

[4] Although Ms. Viessman has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical. It is understood that both Titles are applicable to Ms. Viessman's application. Any divergence between the regulations for either Title will be noted.

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  The five steps are as follows:

**Step One**:  Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.   Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.   The Parties' Positions

Ms. Viessman asserts the Commissioner erred in three ways: (1) by failing to identify all her medically determinable impairments and their severity; (2) by failing to properly determine her RFC;[5] and (3) by failing to carry

---

[5] This assignment of error has two sub-parts.

his burden to show by substantial evidence at Step 5 of the sequential analysis of properly identifying jobs Ms. Viessman is capable of performing.[6]  The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.  Ms. Viessman's assignments of error are discussed below.

### 1. Whether the ALJ Failed to Identify all Ms. Viessman's Medically Determinable Impairments and Their Severity

Medically determinable impairments are impairments which can be shown by medically acceptable clinical and laboratory diagnostic techniques based on medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 404.1508.  The identification of medically determinable impairments is a crucial step in the 5-step analysis because the ALJ must consider the effect of all medically determinable impairments, both severe and non-severe, upon the claimant's ability to work when formulating the claimant's RFC.  Spicer v. Barnhart, 64 Fed. Appx.  173, 175, (10th Cir. 2003); 20 C.F.R. § 404.1545(e); SSR 96-8p.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe."  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).   A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities.  20 C.F.R. § 1521.  An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental

_____

[6] This assignment of error also has two sub-parts.

ability to do basic work activities." <u>Kirby</u>, 500 F.3d at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." <u>Id</u>. (citation omitted). The claimant bears the burden of showing a severe impairment significantly limits a physical or mental ability to do basic work activities, "but the burden of a claimant at this stage is not great." <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001). Additionally, the impairment must have lasted at least twelve months or be expected to result in death. <u>See</u> 20 C.F.R. § 404.1509.

Ms. Viessman asserts the ALJ erred by failing to identify personality disorder as one of her medically determinable impairments, and that it should have been identified as a severe impairment. <u>See</u> Docket No. 15 at pp. 3-5. The Commissioner responds that the ALJ's failure to identify personality disorder as an impairment, whether severe or non-severe, was not error and even if the ALJ committed error by failing to identify personality disorder as a medically determinable impairment, such error was harmless. This is so, the Commissioner argues, because Ms. Viessman has failed to show what, if any, limitations are caused by personality disorder other than those that are already accounted for by her other mental impairments. <u>See</u> Commissioner's brief, Docket No. 17, at p. 5.

Ms. Viessman's argument regarding her personality disorder stems from the notation by the psychological consultant (Dr. VanKley) who diagnosed her with personality disorder. AR558. The ALJ acknowledged but dismissed this diagnosis by Dr. VanKley (AR21) because, according to the ALJ, the diagnosis

was not otherwise "reflected in the treatment records." AR21. The ALJ did not thereafter discuss personality disorder in its decision.

Ms. Viessman asserts the ALJ's rejection of the consultative examiner's diagnosis of personality disorder because personality disorder was not "reflected in the treatment records" is not a valid reason to reject the diagnosis. In support of her position, Ms. Viessman directs the court's attention to instances in which personality disorder *does in fact* appear in her treatment records.

For example, Ms. Viessman notes the State agency psychological consultants at both the initial level and the reconsideration level found she had a personality disorder, and that it was severe. TR144 (citing the evaluation of Doug Soule, Ph.D. on reconsideration). The court notes, however, that the State agency consultants' evaluations are not *treatment* records. The State agency consultants did not treat Ms. Viessman. Instead they merely reviewed the records of Ms. Viessman's treating physicians in order to reach their conclusions.

Next, Ms. Viessman cites the mental evaluation conducted by Paige Anderson in November, 2016, (AR678-683) wherein one of the diagnoses was "rule out personality disorder." AR682. In February, 2017, Ms. Viessman saw her treating psychologist who also diagnosed "rule out personality disorder." AR830. By May, 2017, Ms. Viessman's therapist had updated the diagnosis to "unspecified personality disorder." AR833.

One of Ms. Viessman's psychiatrists, on the other hand, in May 2017, diagnosed her with anxiety disorder and bipolar II versus mood disorder, but did not diagnose her with a personality disorder.  See AR836.  Yet another psychiatrist in August, 2017, diagnosed her with bipolar II versus major depression with psychotic features versus personality disorder.  AR845.  Another treating psychiatrist in September, 2017, diagnosed social anxiety disorder and bipolar II with a differential diagnosis of cluster B traits[7] and paranoid personality disorder.  AR851.

The court agrees the ALJ did not sufficiently explain why it did not find Ms. Viessman suffers from personality disorder as a medically determinable impairment (either severe or non-severe) though it was identified by her treating physicians, the consulting physician, and the State agency physicians as a medically determinable impairment.  Ms. Viessman argues this failure constitutes reversible error because no related limitations are properly considered in her RFC.

---

[7] "Cluster B traits" is a phrase used to describe several types of personality disorders.  Cluster B personality disorders are characterized by dramatic, overly emotional or unpredictable thinking or behavior. They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder.

https://www.mayoclinic.org/diseases-conditions/personality-disorders/symptoms-causes/syc-20354463  (all websites cited in this opinion last checked on January 13, 2020).

In support of this argument, Ms. Viessman cites the consultative examiner's (Dr. VanKley's) report wherein at Axis II,[8] Dr. VanKley diagnosed Ms. Viessman with a personality disorder (AR658) and associated with that diagnosis, she manifests symptoms that:

> interfere with her ability to get along with other people, becoming highly reactive to interpersonal conflict. She is quick to assume that she is being disparaged by others while harboring a sense that those around her are somehow better than she and/or that she would fail to meet other people's standards.

AR659. Dr. VanKley also assigned Ms. Viessman a GAF of 45 (AR658), which she asserts is indicative of an inability to be gainfully employed.

The Commissioner counters, however, that the ALJ's failure to recognize personality disorder as one of Ms. Viessman's medically determinable impairments –either severe or non-severe-- does not constitute reversible error. This is so, the Commissioner argues, because Ms. Viessman has not identified any specific *additional limitations* caused by her personality disorder that have not already been included in her RFC because of her other, properly recognized mental impairments. On this point, the court agrees with the Commissioner.

The ALJ recognized that Ms. Viessman had two medically determinable severe mental impairments (depression and anxiety). AR13. These impairments are found at 12.04 and 12.06 of the Listings. A claimant's ability to function in the workplace is to be measured by the "B" criteria listed within

---

[8] There are five diagnostic axes specified in the DSM-IV multi-axial system. Axis II provides information about personality disorders.

https://www.verywellmind.com/five-axes-of-the-dsm-iv-multi-axial-system-1067053

each of the claimant's documented mental impairments.  The "B" criteria are:

(1) understand, remember or apply information; (2) interact with others;

(3) concentrate, persist or maintain pace; and (4) adapt or manage oneself.

See Appendix 1, Subpart P, Part 404, Listing 12:00.E-F;[9] 20 C.F.R.

§404.1520a.  The "B" criteria are the same for depression and anxiety (12.04

and 12.06 of the Listings) as they are for personality disorders (12.08 of the

Listings).

The ALJ gave "little" weight to Dr. VanKley's opinion, but gave "great"

weight to the opinion of the State agency psychological reviewers, who found

Ms. Viessman suffered from a medically determinable impairment of

personality disorder.  See AR144.  The State agency psychological reviewers

indicated Ms. Viessman's personality disorder was severe.  Id.  Though the ALJ

did not adopt the State agency psychological reviewers' opinion that

Ms. Viessman suffered from the medically determinable impairment of

---

[9] Appendix 1, Subpart P, Part 404, Listing 12:00.F.1 instructs:

    F.  How do we use the paragraph B criteria to evaluate your mental
        disorder?

        1.      General.  We use the Paragraph B criteria, in conjunction
        with the rating scale (see 12.00F2), to rate the degree of your
        limitations. We consider only the limitations that result from your
        mental disorders(s).  We will determine whether you are able to use
        each of the Paragraph B areas of mental functioning in a work
        setting.  We will consider, for example, the kind, degree, and
        frequency of difficulty you would have; whether you could function
        without extra help, structure, or supervision; and whether you
        would require special conditions with regard to activities or other
        people (see 12.00D).

personality disorder or that it was severe, the ALJ <u>did</u> adopt the identical functional limitations that the State agency reviewers assigned.

<u>Compare</u> AR151 with AR15 (both limiting Ms. Viessman to "performing simple routine repetitive tasks and . . . occasional and superficial interaction with the public [and coworkers]." Additionally, the State agency psychological reviewers did not find it necessary to distinguish between Ms. Viessman's three mental impairments when determining the severity of the "B" criteria. AR144. Instead, they determined that, as to all three of her mental impairments, she was moderately limited in her ability to understand remember or apply information; moderately limited in her ability to interact with others; moderately limited in her ability to concentrate, persist, or maintain pace; and mildly limited in her ability to adapt or manage herself. The ALJ gave the State agency psychological reviewer opinions "great" weight. AR20.

Ms. Viessman has not shown any mental limitation that she suffers solely as a result of her personality disorder which was not included in her RFC. Instead, the ALJ adopted the opinions of two State agency reviewers in formulating her RFC that specifically *incorporated* mental restrictions which *included* functional limitations based upon the assumption that she has a severe personality disorder in addition to her two other medically determinable severe mental impairments (anxiety and depression). This court therefore finds that if the ALJ committed error by failing to find Ms. Viessman suffered a medically determinable impairment of personality disorder, severe or non-severe, any such error was harmless.

34

Finally, Ms. Viessman relies upon Dr. VanKley's assignment of a GAF score of 45 to support her assignment of error as to this point. GAF uses a scale from 0 to 100 to indicate social, occupational and psychological functioning with a 100 being the most mentally healthy. A GAF of 41 to 50 indicates serious symptoms/impairment in social, occupational, or school functioning while a GAF of 51 to 60 indicates moderate symptoms or difficulty. Nowling v. Colvin, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016). A GAF of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. See https://www.webmd.com/mental-health/gaf-scale-facts.

Although GAFs were still accepted science in the 2010-11 era, both the Eighth Circuit and the Commissioner have recognized since at least 2010 that GAF scores have limited importance. Nowling, 813 F.3d at 1115 n.3. The "Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." Id. (quoting Jones v. Astrue, 619 F.3d 963, 973-74 (8th Cir. 2010)). The Diagnostic and Statistical Manual of Mental Disorders ("DSM")-IV (American Psychiatric Assn. 2000), previously contained references to GAF, but explained that GAF scores have no little or no bearing on an individual's occupational and social functioning. Jones, 619 F.3d at 973 (quoting Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 511

(6th Cir. 2006)).  The new DSM-5 (May, 2013), dispensed with the GAF score.

This court will therefore not find error based upon the ALJ's failure to recognize

personality disorder as a medically determinable impairment based upon

Ms. Viessman's argument that a GAF score, standing alone, indicates she is

incapable of sustained work.

### 2. Whether the RFC Determined by the ALJ is Supported by Substantial Evidence

Residual functional capacity is "defined as what the claimant can still do

despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d

700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC

assessment is an indication of what the claimant can do on a 'regular and

continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."

Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The

formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222

F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's

mental and physical impairments in combination, including those impairments

that are severe and those that are not severe.  Lauer, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the

ALJ "bears the primary responsibility for assessing a claimant's residual

functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[10] <u>Lauer</u>, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." <u>Id.</u> (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." <u>Id.</u> "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." <u>Id.</u>

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. <u>Id.</u> at n. 8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. <u>Id.</u>

---

[10] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. <u>See</u> SSR 96-8p.

However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  SSR 96-8p.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician.  Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records.  Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were recently reaffirmed in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017).  In Combs, the claimant alleged disability as a result of combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and obesity.  Id. at 643.  The only medical opinions in the file regarding Ms. Combs' RFC were from two state agency physicians who had never treated or examined Ms. Combs.  Id. at 644.  Those physicians instead based their opinions on their review of Ms. Combs' medical records.  They gave differing opinions as to Ms. Combs' RFC (one opined she was capable of light duty work, while the other opined she was capable of only sedentary work).  Id. at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective complaints not entirely credible based upon the ALJ's own review of her medical records and notations therein which indicated she was in "no acute distress" and that she had "normal movement of all extremities."  Id.  The state agency physicians apparently did not base their opinions on these observations.  Ms. Combs asserted the ALJ should have contacted the physicians for clarification of what the notations meant rather than rely upon its own inferences.  Id. at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its own inferences as to the relevance of the two phrases "no acute distress" and "normal movement of all extremities" as it was significant to her conditions. Id. at 647. The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion. Id. So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record. Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ." Id. at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14.

The ALJ formulated Mr. Viessman's RFC as follows:

[T]he claimant has the residual functional capacity to perform less than a full range of sedentary work as defined by 20 CFR 404.1567(a) and 416.967(a). The claimant can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. She can stand and walk 2 hours in an 8-hour workday and sit 6 hours. She can occasionally climb ramps and stairs, but can never climb

ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid even moderate exposure to hazards. The claimant is limited to performing simple routine repetitive tasks. She can have occasional and superficial interaction with the public and coworkers.

AR15. Ms. Viessman asserts the RFC determined by the ALJ is not supported by substantial evidence. This assignment of error is divided into two sub-parts, discussed separately below.

### a.    The Physical RFC Assessment

Ms. Viessman asserts the ALJ's determination as to her physical abilities is flawed for several reasons. First, Ms. Viessman observes that the ALJ cited as support for its RFC the opinions of the State agency physicians, who never examined or treated Ms. Viessman. Ms. Viessman cites Nevland, 204 F.3d at 858, for the proposition that the opinions of doctors who have never examined the claimant "ordinarily do not constitute substantial evidence on the record." Id. The Commissioner counters that State agency medical consultants are "experts in the evaluation of medical issues in disability claims under the Act," citing SSR 17-2p and 20 C.F.R. § 404.1513a, and that such expert opinion may, under the right circumstances, constitute substantial evidence to support the RFC finding. Julin v. Colvin, 826 F.3d 1082, 1089 (8th Cir. 2016).

Ms. Viessman urges, however, that this is not an instance in which reliance on the State agency physician's opinions is justified because upon closer inspection, the reasons the ALJ offered for its reliance upon the State agency opinions do not hold up. The ALJ's first stated reason for reliance on

the State agency physician opinions (AR20) was that "[t]he opinions are consistent with the residual functional capacity determination . . ."

Ms. Viessman urges that is exactly backwards and clearly not an appropriate reason. The court agrees. The ALJ should first evaluate which expert medical opinions are best supported by the record as a whole, *then* formulate the RFC, not formulate the RFC and then adopt the medical opinions that are consistent the ALJ's pre-conceived version of the RFC. An RFC that is formulated in such a fashion "puts the cart before the horse." Reindl v. Astrue, 2010 WL 2893611 at *12 (N.D. Ill. July 22, 2010). "The ALJ is not at liberty to first create an RFC and then disregard evidence that may contradict it. Rather, the ALJ must determine the RFC based on a consideration of all relevant evidence presented in the record." Id. See also Brindisi v. Barnhart, 315 F.3d 783, 788 (7th Cir. 2003) (ALJ's explanation finding statements in the record that support its ruling credible and rejecting those that do not support it "turns the process on its head." Instead, the ALJ should have evaluated credibility of the statements as an initial matter in order to come to a decision on the merits). Dogan v. Astrue, 751 F. Supp.2d 1029, 1041 (N.D. Ind. 2010) (same).

Second, Ms. Viessman observes the ALJ cited as a reason to adopt the State agency physician opinion was that it was "consistent with . . . the findings from the physical consultative examiner." AR20. But the ALJ gave only partial weight to the opinion of the consultative examiner, while giving great weight to the non-treating, non-examining State agency physicians. AR20.

"The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)); <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425 (8th Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. <u>Wagner v. Astrue</u>, 499 F.3d 842 849 (8th Cir. 2007). Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. <u>Wagner</u>, 499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence. <u>Harvey</u>, 368 F.3d at 1016. Also, where a non-treating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. <u>Flynn v. Astrue</u> 513 F.3d 788, 792 (8th Cir. 2008)(citing <u>Casey v. Astrue</u>, 503 F.3d 687, 691-692 (8th Cir. 2007)).

Here the court compares the RFC as formulated by the ALJ with the opinions expressed by the consultative examiner, Dr. Lichter, and the RFC as it

was articulated by the State agency physician.  The only one of these physicians to actually lay eyes on  Ms. Viessman was Dr. Lichter, and all of the others formed their opinions about her abilities upon Dr. Lichter's observations.

- Dr. Lichter stated "based on the objective findings of this exam, it is my opinion that the claimant would only be able to lift and carry 10 pounds occasionally and no more at any time.  She would have difficulty standing, walking, or sitting during an 8-hour workday. However, she does better if she is able to change positions frequently.  She cannot stoop, climb, or kneel.  She has no trouble seeing, hearing, speaking, or traveling.  No concerns with her being exposed to dust, fumes, temperature changes or hazards.

- Dr. Erickson (State agency physician who reviewed Dr. Lichter's report) assigned the following RFC:  Ms. Viessman can occasionally lift 10 pounds and frequently lift less than 10 pounds.  She can stand/walk for a total of 2 hours out of an 8-hour workday.  She can sit with normal breaks for 6 hours out of an 8-hour workday. She has no limits on push/pull.  She can climb ramps, stairs, ladders, ropes, and scaffolds occasionally.  She can balance frequently.  She can stoop, kneel, crouch, and crawl occasionally. She has no manipulative, visual, or communicative limitations. She must avoid concentrated exposure to extreme cold and vibration.  She must avoid even moderate exposure to hazards such as machinery and heights.

- Finally, the ALJ's RFC (physical portion only):  [T]he claimant has the residual functional capacity to perform less than a full range of sedentary work as defined by 20 CFR 404.1567(a) and 416.967(a). The claimant can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently.  She can stand and walk 2 hours in an 8-hour workday and sit 6 hours.  She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She must avoid even moderate exposure to hazards.

The ALJ adopted the State agency physician's opinions for the most part, with a few exceptions (i.e. the ALJ limited Ms. Viessman to never climbing ladders, ropes or scaffolds, whereas the State agency physician said she could

do these things occasionally).    A reading of the State agency physician's opinion, wherein the physician weighed the medical evidence and assigned physical limitations (AR146-47) reveals that the State agency physician on reconsideration (Dr. Erickson) purported to base his opinions entirely upon Dr. Lichter's consultative exam (see AR147).  Dr. Erickson assigned "other" weight to Dr. Lichter's findings. Yet the State agency physician greatly modified the physical restrictions deemed appropriate by the Dr. Lichter.  AR147.  But Dr. Lichter, who actually met with, talked to, and examined Ms. Viessman, explained Ms. Viessman would "have difficulty" standing, walking, or sitting during an 8-hour workday and would be required to change positions.  These observations, and the requirement to change positions were eliminated from Dr. Erickson's (and the ALJ's) RFC.

Dr. Lichter also opined that Ms. Viessman could <u>never</u> stoop, climb, or kneel. This prohibition was also eliminated (without explanation) from Ms. Viessman's RFC by both Dr. Erickson and by the ALJ.  Neither Dr. Erickson nor the ALJ explained why they decided to eliminate these physical restrictions.

The Commissioner asserts the ALJ properly formulated the RFC because it properly explained the conflict by noting it had considered the opinion evidence along with other record evidence such as Ms. Viessman's work history and her activities of daily living.  <u>See</u> Commissioner's brief, Docket No. 17 at p. 7.   The ALJ did not directly correlate these factors to its decision to eliminate the physical restrictions expressed by Dr. Lichter in favor of the more

45

rigorous RFC outlined by the Stage agency physician, but assuming such explanation, the court rejects it.

Starting with Ms. Viessman's work history, the ALJ stated that it did not add significant weight to her allegations because her impairments had been present since the mid-2000's, but the record did not reflect that her condition had significantly deteriorated.  AR20.  The ALJ continued that despite her physical condition, Ms. Viessman had managed to work at a level that was above substantial gainful activity (SGA) "most" years after 2002, and that in 2016 (her  alleged year of onset)  her earnings were "close" if not higher, than in previous years.  The court therefore examines the amount of annual SGA earnings set by the SSA for the years 2002 through the date of the ALJ's decision (August, 2018), compared to Ms. Viessman's earnings to determine which years she was able to meet the SGA standard:

| YEAR | SGA | VIESSMAN'S EARNINGS | SGA MET? |
|------|-----|---------------------|----------|
| 2002 | 9,300 | 11,616 | YES |
| 2003 | 9,600 | 11,891 | YES |
| 2004 | 9,720 | 16,329 | YES |
| 2005 | 9,960 | 15,905 | YES |
| 2006 | 10,320 | 8,860 | NO |
| 2007 | 10,800 | 2,242 | NO |
| 2008 | 11,280 | 12,770 | YES |
| 2009 | 11,760 | 12,612 | YES |
| 2010 | 12,000 | 8,669 | NO |
| 2011 | 12,000 | 11,846 | NO |
| 2012 | 12,120 | 12,712 | YES |
| 2013 | 12,480 | 12,483 | YES |
| 2014 | 12,840 | 16,673 | YES |
| 2015 | 13,080 | 9,760 | NO |
| 2016 | 13,560 | 10,837 | NO |
| 2017 | 14,040 | 161.91 | NO |

See www.sss.gov/oact/cola.sga.html (table showing monthly SGA by year) and AR260 (Ms. Viessman's earnings by year). From 2002 through 2017, Ms. Viessman reached SGA 9/16 years, but she did not reach SGA 7/16 years. The ALJ is correct that she met SGA the "majority" of these years, but the ALJ's analysis regarding Ms. Viessmann's earnings does not provide substantial weight for failing to credit her allegations of physical pain.

Ms. Viessman's earnings were usually barely at SGA levels during the years she met SGA. She technically earned above SGA "most" years after 2002, but her earnings were hardly consistent. Ms. Viessman's earnings swung wildly. She earned over $16,000 in 2004, but three years later in 2007 she earned only a little over $2,000. In 2010, 2015 and 2016 she again did not earn SGA. Medical records are only available beginning in 2015, so it is impossible to know how her medical condition compares in 2018 as to 2002 or why there are such large gaps in her earnings.

The other reason the ALJ offered for failing to credit Ms. Viessman's physical complaints was that the RFC it formulated was consistent with her activities of daily living. These activities included caring for her own personal hygiene and taking care of her eight-pound dog. AR298. In her function report (AR299), completed in 2016, she reported she lived alone was able to do "all" house and yard work. Id. But in her 2018 hearing testimony, Ms. Viessman stated that she lived with two other people, and that one of her roommates did all the household chores, including the laundry. AR81. Ms. Viessman explained that she was unable to do any of these things, and that the

47

roommate "takes care of me because I can't go up and down the stairs, and wash the laundry, and yeah. She does all the cleaning; she does, you know, everything." Id.

A claimant need not prove she is bedridden or completely helpless to be found disabled. Thomas v. Shalala, 876 F.2d 666, 669 (8th Cir. 1989). To find a claimant has the capacity to perform a certain type of work, she "must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. Substantial gainful activity means working with "reasonable regularity either in competitive or self-employment." Id. The courts have repeatedly held that a claimant's ability to engage in basic personal activities such as cooking, cleaning, or simple hobbies does not constitute substantial evidence that she has the functional capacity to engage in substantial gainful activity. Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000); Eback v. Chater, 94 F.3d 410, 412-413 (8th Cir. 1996). The substantial evidence as a whole does not support the ALJ's conclusion that Ms. Viessman's ADLs are consistent with her physical RFC. On remand, the ALJ should reconsider this portion of the analysis as well.

When opinions of physicians who have never seen or treated the claimant conflict with opinions of a consulting physician who has examined the claimant, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole,

especially when they are contradicted by the treating physician's medical opinion. Id.; Harvey, 368 F.3d at 1016. Here, the ALJ's formulation of the RFC is supported by the State agency physicians, but those opinions conflict with the opinion of Dr. Lichter, the only physician who offered an opinion that actually examined Ms. Viessman. The justifications offered by the ALJ (Ms. Viessman's work history and ADLs) which purport to resolve the conflict *do not* resolve the conflict for the reasons explained above. This court therefore agrees that the physical portion of the RFC is not supported by substantial evidence.

### b. The Mental RFC Assessment

Ms. Viessman also asserts the mental portion of her RFC assessment is not supported by substantial evidence. She observes the ALJ assigned "little" weight to the opinion of Dr. VanKley—the only physician who actually examined her that offered an opinion about her mental limitations. See AR144-46 (Dr. Soule, State agency psychiatrist on reconsideration); AR652-660 (Dr. VanKley's report). The reasons offered by the ALJ for its assignment of "little" weight to Dr. VanKley's opinion were: (1) the diagnosis of personality disorder was not supported by Ms. Viessman's treatment records; (2) Dr. VanKley's comment that Ms. Viessman's part-time work was actually therapeutic for her; and; (3) Dr. VanKley's conclusions (accurately) recounted her symptoms, but the objective findings were minimal and Dr. VanKley's conclusions did not provide a specific functional analysis for Ms. Viessman's capacity to understand, interact, concentrate, and interact. AR21.

Ms. Viessman asserts the opinions of non-examining physicians ordinarily do not constitute substantial evidence in the record, and that the reasons offered by the ALJ for failing to credit Dr. VanKley's opinions do not provide "good" reasons for rejecting his opinions. Ms. Viessman also asserts the mental RFC is not supported by substantial evidence because Dr. VanKley's assignment of a 45 GAF is persuasive evidence of her inability to work.

For the reasons the court has already explained in section D.1 above, the court rejects Ms. Viessman's assertion that the GAF score assigned by Dr. VanKley carries the day as to her mental functional abilities in the workplace.

But Dr. VanKley was the only psychiatric expert who offered an opinion about Ms. Viessman's mental abilities who actually examined Ms. Viessman. The State agency experts based their opinions upon Dr. VanKley's notes, and the ALJ gave "great" weight to the State agency physician's opinion but only "little" weight to Dr. VanKley's opinion, in part because Dr. VanKley did not assign specific limitations. AR21.

The disconnect occurred when the State agency physicians purported to base their opinions upon Dr. VanKley's examination, but Dr. VanKley—who was in the best position to assign limitations based upon Ms. Viessman's mental conditions, failed to assign specific limitations. It is unknown whether Dr. VanKley was ever asked to do so. It does not appear anyone ever asked Dr. VanKley to address the same specific questions that were asked of the

State agency psychiatrists on the mental residual functional capacity assessment (MRFC). The ALJ did not contact Dr. VanKley to clarify whether the State agency physician on reconsideration (Dr. Soule) correctly interpreted Dr. VanKley's exam notes and whether the functional limitations assigned by Dr. Soule were consistent with the limitations Dr. VanKley observed when he examined Ms. Viessman. This is despite Dr. VanKley's specific invitation for questions or further assistance from him, if needed. AR659.

The MRFC (AR149-151) contains very specific inquiries about Ms. Viessman's mental abilities as they pertain to workplace functions. The State agency physician indicated in each of these categories whether Ms. Viessman's ability to function was limited and if so, to what degree. Id. If the State agency physician indicated Ms. Viessman's ability was limited then the State agency physician explained further in narrative form Ms. Viessman's capacities or limitations. Id.

The functions evaluated in the MRFC include:

1.    Understanding and memory limitations

-The ability to remember locations and work-like procedures
-The ability to understand and remember very short and simple
 Instructions
-The ability to understand and remember detailed instructions

2.    Sustained Concentration and Persistence Limitations

-The ability to carry out very short and simple instructions
-The ability to carry out detailed instructions
-The ability to maintain attention and concentration for extended periods
-The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

-The ability to sustain an ordinary routine without special
supervision
-The ability to work in coordination with or in proximity to others
without being distracted by them
-The ability to make simple work-related decisions
-The ability to complete a normal workday and workweek without
interruptions from psychologically based symptoms and to perform
at a constant pace without an unreasonable number and length of
rest periods.

3.    Social Interaction Limitations

-The ability to interact appropriately with the general public
-The ability to ask simple questions or request assistance
-The ability to accept instructions and respond appropriately to
criticism from supervisors
-The ability to get along with coworkers or peers without
distracting them or exhibiting behavioral extremes
-The ability to maintain socially appropriate behavior and to
adhere to basic standards of neatness and cleanliness

4.    Adaptation Limitations

-The ability to respond appropriately to changes in the work setting
-The ability to be aware of normal hazards and take appropriate
precautions
-The ability to travel in unfamiliar places or use public
transportation
-The ability to set realistic goals or make plans independently of
others

See AR149-51.   The court agrees with the Commissioner that the GAF

score is not conclusive evidence of Ms. Viessman's functionality in the

workplace.  But Dr. VanKley's assignment of such a low GAF score "is a

subjective determination that represents [his] judgment of [Ms. Viessman's]

overall level of functioning." Jones, 619 F.3d at 973.  Recall that a score

between 41-50 generally indicates serious symptoms/impairment in social,

occupational, or school functioning while a GAF of 51 to 60 indicates moderate

symptoms or difficulty.  Nowling, 813 F.3d at 1115 n.3.  Clearly then,

Dr. VanKley at least generally believed Ms. Viessman had some serious symptoms or impairment. This conclusion is supported not only by the assignment of a GAF score of 45, but also by Dr. VanKley's description of Ms. Viessman's overall ability to function in the SUMMARY/CONCLUSIONS section of his report. AR658-59. This must be contrasted to the relatively mild limitations assigned by the State agency physician who purported to rely upon Dr. VanKley's report. The stark difference between the limitations imposed by the State agency physician and the Dr. VanKley's general indication of serious symptoms/impairment imposed upon the ALJ a duty to inquire, which duty the ALJ failed to carry out.

The ALJ faulted Dr. VanKley for failing to impose specific limitations, but did not avail itself of Dr. VanKley's invitation to answer any questions or concerns. AR659. In cases where the medical evidence is inconclusive, in particular where the evidence does not support a treating source's opinion, the ALJ is encouraged to gather additional information, either by re-contacting a treating source or by consulting a medical expert. See Social Security Ruling 96-2p (July 2, 1996); Social Security Ruling 96-5p (July 2, 1996). See also Flynn, 513 F.3d at 792 ("[i]f the ALJ does not find any of the medical opinions credible, then she should develop the record further to include medical evidence of a claimant's limitations.") (citing Lauer, 245 F.3d at 704).

This is consistent with the fact that social security hearings are non-adversarial and that the ALJ has a duty to "develop the record fairly and fully, independent of the claimant's burden to press his case." Cox v. Astrue, 495

53

F.3d 614, 618 (8th Cir. 2007) (quoting <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004)).  This duty applies even where the claimant is represented by counsel.  <u>Bowman v. Barnhart</u>, 310 F.3d 1080, 1083 (8th Cir. 2002); <u>Hildebrand v. Barnhart</u>, 302 F.3d 836, 838 (8th Cir. 2002); <u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir. 1994).  Under such circumstances, the ALJ was under a duty to further develop the record, either by re-contacting Dr. VanKley  or by contacting a different medical expert to inquire about whether the State agency opinions should be given "great" weight in light of the disparity between the picture of Ms. Viessman's condition painted in Dr. VanKley's report and the relatively mild functional limitations assigned by the State agency experts.  <u>See</u> SSR 96-2p.  For these reasons, the court agrees Ms. Viessman's mental RFC is not supported by substantial evidence in the record.  Remand is required as to this issue.

> **3.** **Whether the Commissioner Carried His Burden at Step 5 of the Sequential Analysis to Identify Jobs Ms. Viessman Can Perform**

Ms. Viessman's final assignment of error is that the Commissioner failed to carry his burden at Step 5 of the analysis to identify jobs in the national economy that Ms. Viessman is capable of performing. Ms. Viessman's argument in this regard is divided into two sections, discussed separately below.

> **a.** **Conflicts with the DOT**

When a vocational expert (VE) provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask

about any possible conflict between that VE's evidence and the information provided in the Dictionary of Occupational Titles. <u>Jones</u>, 619 F.3d at 977-78. This responsibility is mandated by the Commissioner's own Policy, SSR 00-4p. <u>Id.</u> An ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut the DOT classifications. <u>Id.</u> And when the VE testimony conflicts with the DOT, the DOT controls when the DOT classifications are not rebutted. <u>Id.</u> at 978.

Ms. Viessman asserts there is an unexplained discrepancy between the RFC as described by the ALJ and the VE's testimony regarding the jobs identified as being consistent with said RFC. Specifically, in its written decision, the ALJ indicated Ms. Viessman was capable of "only simple, routine repetitive tasks. She can have occasional and superficial interaction with the public and coworkers . . . " AR15. Ms. Viessman asserts this limitation is inconsistent with the Reasoning Level of the jobs identified as appropriate for her (credit clerk, DOT 237.367-014; document preparer, DOT 249.587-018; and telephone quotation clerk, DOT 237.367-046) by the VE, which she asserts require a Reasoning Level of 3.[11]

The Dictionary of Occupational Titles (DOT) contains several component sections which define the requirements of the jobs contained therein. The General Educational Development (GED) component includes a Reasoning Level for each occupation within the DOT that corresponds to the ability

---

[11] The Commissioner does not dispute these occupations carry a Reasoning Level of 3.

required for satisfactory job performance.  <u>See</u> DOT at 1009-11.  <u>Hulsey v.</u>

<u>Astrue</u>, 622 F.3d 917, 923 (8th Cir. 2010).  Ms. Viessman asserts the ALJ's

restriction to "only simple, routine repetitive tasks, . . ." is consistent with only

the lowest Reasoning Level in the DOT, which is  Level 1.

There are six  Reasoning Levels within the GED.  They are described as

follows:

Level 1: Apply commonsense understanding to carry out simple
one-or-two-step instructions.  Deal with standardized situations
with occasional or no variables in or from these situations
encountered on the job.

Level 2:  Apply commonsense understanding to carry out detailed
but uninvolved written or oral instructions.  Deal with problems
involving a few concrete variables in or from standardized
instructions.

Level 3:  Apply commonsense understanding to carry out
instructions furnished in written, oral, or diagrammatic form.  Deal
with problems involving several concrete variables in or from
standardized situations.

Level 4:  Apply principles of rational systems to solve practical
problems and deal with a variety of concrete variables in situations
where only limited standardization exists.  Interpret a variety of
instructions furnished in written, oral, diagrammatic or schedule
form.  (Examples of rational systems include bookkeeping, internal
combustion engines, electric wiring systems, house building, farm
management, and navigation).

Level 5:  Apply principles of logical or scientific thinking to define
problems, collect data, establish facts, and draw valid conclusions.
Interpret an extensive variety of technical instructions in
mathematical or diagrammatic form.  Deal with several abstract
and concrete variables.

Level 6:  Apply principles of logical or scientific thinking to a wide
range of intellectual and practical problems.  Deal with nonverbal
symbolism (formulas, scientific equations, graphs, musical notes,
etc.) in its most difficult phases.  Deal with a variety of abstract

and concrete variables.  Apprehend the most abstruse classes of concepts.

<u>See</u> Dictionary of Occupational Titles, Appendix C.

The ALJ's hypothetical to the VE and the RFC that was ultimately formulated by the ALJ both included the limitations of the ability *to perform only simple, routine tasks* and having only *occasional and superficial interaction with the public and co-workers.*  Ms. Viessman asserts the restriction to perform only simple, routine tasks is compatible only with Reasoning Level 1, while the Commissioner in brief cites <u>Renfrow v. Astrue</u>, 496 F.3d 918, 921 (8th Cir. 2007) for the proposition that a claimant who is limited to "simple, concrete instructions" is capable of a job requirement Level 3 reasoning.  But that is not exactly what <u>Renfrow</u> says.

In <u>Renfrow</u> the Social Security claimant, Ms. Renfrow, alleged the ALJ erred because it failed to ask the VE at Step 5 of the analysis whether the VE's testimony was consistent with the DOT.  <u>Id.</u> at 920.  The court noted the ALJ was required "not only to ask the expert whether there was a conflict, but also to obtain an explanation for any such conflict."  <u>Id.</u> at 920-21.  The ALJ did not follow the policy, so the court agreed the ALJ erred.  <u>Id.</u> at 921.  But, the court concluded, the error was harmless because there was no actual conflict between the VE's testimony and the DOT.  <u>Id.</u>  This was so, the court concluded, because the jobs identified by the VE required a Reasoning Level of 3, and the hypothetical the ALJ explained to the VE stated the claimant "could not be expected to do complex technical work."  <u>Id.</u> at 920-921.  This is different from the hypothetical in this case, wherein the ALJ stated

Ms. Viessman could only do simple, routine tasks.  In <u>Renfrow</u> the court concluded that an "inability to do complex work" was not necessarily in conflict with the description of Reasoning Level 3.  <u>Id.</u> at 921.

The <u>Renfrow</u> court also cited <u>Hillier v. Social Security Administration</u>, 486 F.3d 359 (8th Cir. 2007), noting the expert's opinion in that case that the claimant, who was limited to "following simple, concrete instructions," could work as a cashier was not necessarily inconsistent with the DOT description of a cashier, which required Level 3 reasoning.  <u>Renfrow</u>, 496 F.3d at 921 (citing <u>Hillier</u>, 486 F.3d at 367).  That would seem to support the Commissioner's argument in this case that the RFC as described by the ALJ (Ms. Viessman's ability to complete simple, routine tasks) contains no conflict with a DOT Reasoning Level of 3.  Again, however, a close reading of <u>Hillier</u> reveals a much different factual scenario than the one presented by this case.

In <u>Hillier</u>, the claimant had previously worked as a cashier at several different  jobs including fast-food chains and retail stores.  <u>Hillier</u>, 486 F.3d at 362.  The RFC as described by the ALJ in her case indicated a person who could perform "simple, concrete work that is unskilled *or* semi-skilled."  <u>Id.</u> at 363, 365-66 (emphasis added).   On appeal, Ms. Hillier asserted that cashier work required Level 3 Reasoning skills, which was inconsistent with her limitation to remembering and following concrete instructions.  <u>Id.</u> at 366.  The court acknowledged that in the abstract, there is tension between only being able to understand, remember and follow simple, concrete instructions and working as a cashier (i.e. Level 3 Reasoning skills).  <u>Id.</u> at 367.  But in Hillier's

case, the court explained, Ms. Hillier had previously worked as a cashier in both the restaurant and retail industries.  Id.  Her past work experience, in combination with the absence of any evidence of deterioration since she had last performed those jobs, demonstrated she had the mental capacity to work as a cashier.  Id.  Additionally, the court stated the vocational expert's testimony adequately responded to the hypothetical question posed by the ALJ and Ms. Hillier's job history supported the conclusion that she could work as a cashier.  The VE testified Ms. Hillier remained able to work as a cashier, either at the unskilled or semi-skilled level.  Id. at 363.

In Ms. Viessman's case, her past relevant work (PRW) included being a day care owner and a travel agent.  AR21.  She did not have past relevant work performing any of the occupations identified by the ALJ as those she is supposed to be capable of performing which include Level 3 Reasoning Skills (credit clerk, DOT 237.367-014; document preparer, DOT 249.587-018; and telephone quotation clerk, DOT 237.367-046).  Additionally, there can be no argument that testimony by the VE cleared up any confusion or excused the unresolved conflict between the RFC as articulated by the ALJ and the Level 3 Reasoning requirements as contained in the three jobs identified by the VE, because the VE offered absolutely no such explanatory testimony.  The entirety of the exchange between the ALJ and the VE during the administrative hearing is reproduced below:

> ALJ:     Dr. Perry, we have your assessment in the file.  It has one job, daycare owner.  Can you please categorize the other job as well?

VE:     Yes, your honor.  Just give me a second here to pull up my stuff.  The travel agent DOT number is 252.152-010.  It's classified as skilled work.  It has an SVP of 5.  And it's also classified as sedentary work.

ALJ:    Dr. Perry, consider, please, an individual of claimant's age, education, and previous work history who can perform a range of sedentary as follows:  who can lift and carry 10 pounds occasionally, and less than 10 frequently; can stand or walk two hours in an eight-hour day, and sit six hours; can occasionally climb ramps, stairs, but never ladders, ropes or scaffolds.  Such an individual can occasionally balance, stoop, kneel, crouch, and crawl.  The individual must avoid even moderate exposure to workplace hazards; is limited to simple, routine tasks, and occasional and superficial interaction with the public and coworkers.  Can this individual perform any of claimant's past relevant work?

VE:     Well, your honor, the daycare position would be impossible because it's light work, and it's also semi-skilled work.  The travel agent work, even though it's sedentary, would not be possible because it's skilled work.  The hypothetical person would be limited to unskilled, sedentary work.

ALJ:    Can such an individual perform any jobs in the national economy?

VE:     Yes, sir.  I'll give you three examples.  The first job title is credit clerk.  The DOT number is 237.367-014.  The number of those jobs nationally, 42,000.  A second example is a job of document preparer. DOT number 249.587-018.  The number of those jobs nationally, 44,000.  The third example is the job of a telephone quotation clerk.  DOT number 237.367-046.  Nationally, there are 86,000 telephone quotation clerk positions.

ALJ:    Dr. Perry, if an individual, due to psychological conditions, were absent, tardy, or would leave work early more than two days per month on a consistent basis, can such an individual maintain gainful employment in the national economy?

VE:     No, your honor.  Such an individual would not be capable of competitive full-time employment.  That would be considered excessive absenteeism.

ALJ:    Dr. Perry, if an individual suffered from psychological conditions that caused a substantial loss of ability to respond

> appropriately to supervision, coworkers, and usual work
> situations, such that the individual would have confrontations in
> the workplace on a once a month basis resulting in work stoppage,
> can such an individual maintain gainful employment in the
> American economy?

> VE:     Well, your honor, in my experience, when that happens, a
> person was given a warning the first time. And after that, if it
> happens again, they are dismissed.

> ALJ:    Has your testimony been consistent with the Dictionary of
> Occupational Titles?

> VE:     For the most part it has, your honor. These last two
> questions about absenteeism or inability to accept supervision.
> Those are not in the DOT, and so I've answered based on my
> experience of over 30 years as a vocational expert.

See AR103-06.

In Ms. Viessman's case, unlike Hillier, the ALJ did not modify the limitation of the ability to perform only simple routine tasks with the ability to perform work which is at the unskilled and semi-skilled level. See AR15, 104. Additionally, though the VE stated his testimony was consistent with the DOT, the Eighth Circuit has specifically stated that in the abstract, tension exists between only being able to understand, remember and follow simple, concrete instructions and the ability to perform a job which requires Level 3 Reasoning skills. Hillier, 486 F.3d at 367. None of the factors which removed that case from the abstract are present here. In the absence of some further clarification or explanation from the VE, simply stating there is no conflict is not sufficient. Moore v. Colvin, 769 F.3d 987, 989-90 (8th Cir. 2007) (ALJ's duty to resolve the conflict between VE evidence and DOT is not resolved merely by eliciting a "yes" answer from VE that VE's testimony is consistent

with the DOT when there is an apparent unresolved conflict).[12]   Remand is

required to resolve the apparent conflict between the VE's testimony and the

DOT information in this case.

**b.    Work which Exists in the National Economy Pursuant to 42 U.S.C. § 423(d)(2)(A)**

Finally, as to each of the jobs identified by the VE as being appropriate

for Ms. Viessman to perform, the VE identified the numbers of such jobs only

as they were available "nationally" (credit clerk 42,000 nationally; document

preparer 44,000 nationally; telephone quotation clerk 86,000 nationally).

AR104-05.  This, however, is not in compliance with the requirement of the

Social Security Act.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d)    "Disability" defined

(1)    The term "disability" means—

(A)    Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

---

[12] Ms. Viessman also raises a conflict with two of the three occupations cited by the ALJ as appropriate for her (credit clerk and telephone quotation clerk) because, she asserts, they require frequent talking and frequent hearing.  The ALJ's formulation of Ms. Viessman's RFC limits her to only occasional and superficial interaction with the public and coworkers.  The Commissioner does not dispute a conflict exists with those two occupations.  The Commissioner correctly notes, however, that Ms. Viessman raised no conflict with the third potential occupation (document preparer).  Because the Commissioner concedes a conflict in this regard with the first two occupations and because remand is necessary as to the unresolved conflict presented by the Reasoning Level 3 for all three occupations, the court does not address this second portion of Ms. Viessman's argument.  On remand, however, the ALJ should ask the VE to resolve this second portion of Ms. Viessman's noted conflict as well.

* * *

(2)     For purposes of paragraph (1)(A)—

(A)     An individual shall be determined to be under a
disability only if his physical or mental impairment or
impairments are of such severity that he is not only
unable to do his previous work but cannot,
considering his age, education, and work experience,
engage in any other kind of substantial gainful work
which exists in the national economy, regardless of
whether such work exists in the immediate area in
which he lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he applied for
work. ***For purposes of the preceding sentence*** (with
respect to any individual), ***"work which exists in the
national economy" means work which exists in
significant numbers either in the region where
such individual lives or in several regions of the
country.***

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which

exists in the national economy" is a term of art in Social Security law.  It does

not mean work in the entire United States.  Instead, it means "work which

exists in significant numbers either in the *region* where such individual lives or

in *several regions* of the country."  Id. (emphasis added).

The Commissioner cites Long v. Chater, 108 F.3d 185, 188 (8th Cir.

1997), in support of affirming the ALJ's decision.  This case does not

contravene the clear meaning of the statute cited above.  The court in Long

noted there were 650 surveillance monitoring, addressing, and document

preparation jobs in Iowa, the claimant's region.  Long, 108 F.3d at 188.  Thus,

the court's affirmance of the ALJ was based on evidence of jobs available in the

claimant's "region," in conformity with the statute.  Id.  This case does not stand for the proposition that there need not be evidence of the number of jobs available in the claimant's region or in the several regions of the country.

To adopt the Commissioner's position—a position repeatedly asserted before this court in a number of Social Security appeals—would be to disregard a portion of the statutory language.  The statute states clearly **" 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."** 42 U.S.C. § 423(d)(2)(A).

The Commissioner would have this court ignore this plain statutory mandate.  This, the court cannot do for the Supreme Court teaches that every provision of a statute must be given effect when construing it:  where a statute can be interpreted so as to give effect to all portions of the statute, that interpretation must prevail over an interpretation that nullifies some portion of the statute.  Morton v. Mancari, 417 U.S. 535, 551 (1974).  "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 665 (2007) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).

Congressional intent is clear:  The Commissioner *does* have to show that jobs exist in Ms. Viessman's "region" or in "several regions of the country." 42 U.S.C. § 423(d)(2)(A).  We know from the statutory language that "region"

does *not* mean "immediate area."  Id.  The Commissioner's regulation likewise does not define "region," but only says that "region" is not equal to "immediate area."  20 C.F.R. § 404.1566(a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region.  This sentiment is paralleled in the Commissioner's regulation where it states:  "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'  We will not deny you disability benefits on the basis of the existence of these kinds of jobs."  20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part."  Webster's New World Dictionary, at 503 (1984).  "A subdivision of the earth or universe."  OED (3d ed. Dec. 2009).  We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country, nor does it mean the claimant's immediate area.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b).  The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.

The court concludes, as it must, that "national economy" does not mean "nationally."  Instead, at Step 5, the ALJ must find that jobs the claimant can

do that exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation).  Id.  The VE did not testify to numbers of jobs existing in Ms. Viessman's region or in "several regions," only that a certain number of jobs existed "nationally."  AR104-05.  This testimony fails to provide support for the ALJ's step five determination.  The burden is on the Commissioner at step five.  Here, he failed to carry that burden.  The court will remand for a reconsideration and redetermination of the ALJ's Step 5 analysis.

**E.**     **Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Viessman requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four. Ms. Viessman's motion to remand [Docket No. 14] is GRANTED and the Commissioner's motion to affirm [Docket No. 16] is DENIED.

DATED January 13, 2020.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge